**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **MANDY WOODS**<br><br>**and**<br><br>**JORGE CORTES,**<br><br>individually, and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>**U.S. DEPARTMENT OF EDUCATION**<br>400 Maryland Avenue, SW<br>Washington, DC 20202,<br><br>Defendant. | Case No.: 1:26-cv-3335 |

**<u>CLASS ACTION COMPLAINT</u>**

**INTRODUCTION**

1. Plaintiffs Mandy Woods and Jorge Cortes ("Plaintiffs") bring this lawsuit on behalf of themselves and other former students of predatory for-profit institutions, to vindicate their legal entitlement to a clean financial slate. Defendant U.S. Department of Education ("ED" or the "Department") deprives them of that right by representing to consumer credit bureaus that Plaintiffs owe substantial and increasing amounts on federal student loan debts that they do not owe. The Department persists in making these false and harmful representations, despite unequivocally and irrevocably extinguishing Plaintiffs' debt obligations years ago. Plaintiffs have invoked all available channels to correct the record, without success. They now invoke this judicial forum to avoid further gratuitous injury from the Department's nonsensical and plain wrong credit reporting.

2. Between April 2022 and January 2025, the Department announced its decisions, based on findings of widespread fraud and misconduct, to grant unconditional federal student loan relief to former students of certain for-profit higher education institutions ("Group Discharge Decisions").

3. ED's Group Discharge Decisions applied automatically to any and all federal loans related to students' attendance at the specified institutions ("Qualified Loan Debt")—covered borrowers were not required to take any action to receive this relief.

4. ED, as the creditor for these loans, maintains records that allow it to identify every federal student loan borrower and all Qualified Loan Debt covered by its Group Discharge Decisions. For example, with each Group Discharge Decision announcement, ED recited the number of individuals with, and the total aggregate dollar amount of, Qualified Loan Debt.

5. In addition to publishing each Group Discharge Decision on its website and issuing press releases, ED provided notice of its Group Discharge Decisions to individuals with Qualified Loan Debt. The notice, among other things, stated unequivocally and unconditionally that the recipient had no present or future obligation to make any payment on their Qualified Loan Debt, and did not have to take any further action.

6. ED acknowledges that its Group Discharge Decisions are final and it therefore lacks any legal basis to collect or attempt to collect, or otherwise enforce or attempt to enforce, Qualified Loan Debt.

7. Notwithstanding these facts, ED continues to describe the Qualified Loan Debt of Plaintiffs, and others similarly situated, to consumer Credit Reporting Agencies (CRAs) as

enforceable debt obligations that must be repaid in full.[1] Indeed, ED tells CRAs that Qualified Loan Debt is *increasing* over time, as interest accrues. This erroneous, inaccurate, and misleading information is reflected on Plaintiffs' consumer credit reports, factors into their credit profiles, and is seen by any individual or entity that utilizes consumer credit information in making determinations about whether to extend credit (and on what terms), offer employment, grant a security clearance, or agree to provide housing.

8. Plaintiffs notified each of the major CRAs of ED's erroneous furnishing of their Qualified Loan Debt by submitting a formal dispute. Each dispute included information establishing that Plaintiffs' Qualified Loan Debt was legally extinguished by the Group Discharge Decisions, including the Department's press releases, its individualized notices to the borrower (where available), and verification of Plaintiffs' dates of attendance at the Group Discharge school within the relevant period of time.

9. Plaintiffs' credit disputes sought reinvestigation by ED not just for themselves, but for all individuals whose credit reports indicated an obligation to repay Qualified Loan Debt.

10. The CRAs provided Plaintiffs' disputes to ED for what should have been a clear-cut reinvestigation and simple resolution. Plaintiffs' disputes are grounded in easily knowable facts: ED had already identified all borrowers with Qualified Loan Debt and does not dispute the essential fact that the repayment obligation is extinguished.

11. ED has failed to correct or update its furnishing to the CRAs regarding Plaintiffs' Qualified Loan Debt.

12. ED's continued furnishing of balances on Qualified Loan Debt plainly violates the

[1] Throughout this Complaint, references to ED's knowledge of or actions taken in relation to Plaintiffs' federal student loans encompass knowledge of or actions taken on its behalf, in its name, and/or at its direction by third-party loan servicers. *See, e.g.*, *infra* ¶¶ 35-42.

Fair Credit Reporting Act (FCRA)'s prohibition on furnishing inaccurate or misleading information. ED's wrongful furnishing has caused Plaintiffs and the proposed class substantial credit-related harm. They face a higher cost of borrowing, the potential loss of credit opportunities, and are at risk of other financial and reputational consequences because their credit reports include tens or even hundreds of thousands of dollars of debt that the Department has conceded they have no obligation to ever repay. They have spent time and resources on attempts to clarify and remedy the situation, and live with the constant fear that the byzantine workings of an indifferent creditor—in this case, their own government—will inflict further wrongful injury, including collection through wage garnishment and tax refund or Social Security offset, in satisfaction of a debt that came into being in the first place because of an educational scam and now refuses to die.

**JURISDICTION AND VENUE**

13. Jurisdiction of this Court arises under 15 U.S.C. § 1681p and 28 U.S.C. §§ 1331, 2201.

14. Venue lies properly in this District pursuant to 28 U.S.C § 1391(e) because ED is headquartered in this District and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

**PARTIES**

15. Plaintiff Mandy Woods is a natural person and resident of California. She is and has been at all relevant times a "consumer" as defined by section 1681a(c) of the FCRA.

16. Plaintiff Jorge Cortes is a natural person and resident of Oregon. He is and has been at all relevant times a "consumer" as defined by section 1681a(c) of the FCRA.

17. Defendant United States Department of Education is a federal agency. Its headquarters are located at 400 Maryland Ave SW, Washington, D.C. Defendant is and has been

at all relevant times a credit furnisher and "person" as defined by section 1681a(b) of the FCRA.

## APPLICABLE LEGAL FRAMEWORK

***Fair Credit Reporting Act (FCRA)***

18. "Congress enacted FCRA in 1970 to ensure fair and accurate credit reporting, promote efficiency in the banking system, and protect consumer privacy." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 52 (2007) (citing 15 U.S.C. § 1681).

19. FCRA-covered entities must follow credit reporting procedures that both meet commercial needs and are "fair and equitable to the consumer." 15 U.S.C § 1681(b).

20. An entity that collects information about consumer debts and discloses it to third parties is known as a Credit Reporting Agency (CRA). Well-known companies like Equifax, Experian, and TransUnion are CRAs, and must comply with the FCRA.

21. Entities that provide information about consumer debt to CRAs are commonly called "furnishers." Furnishers must comply with the FCRA. *See generally* 15 U.S.C. § 1681s-2.

22. The FCRA requires that furnishers provide only complete and accurate information to CRAs. 15 U.S.C. § 1681s-2(a)(1)-(2), (b)(1). The information about consumer debt provided by a furnisher to a CRA may include the account balance, last payment date, the monthly payment due, any amounts that are past due, and the status of the account.

23. The FCRA gives consumers the right to dispute inaccurate information collected (and maintained for disclosure to third parties) by CRAs. 15 U.S.C. § 1681i(a)(1)(A).

24. Upon receiving a dispute of the completeness or accuracy of any item of information in the consumer's file, the CRA must "provide notification of the dispute to [the furnisher] who provided any item of information in dispute" to the CRA and "shall include all relevant information regarding the dispute that the [CRA] has received from the consumer[.]" 15 U.S.C. § 1681i(a)(2).

25. Once notified by the CRA, the furnisher must "conduct an investigation with respect to the disputed information[,] . . . review all relevant information provided by [the CRA, and] report the results of the investigation to the [CRA]." 15 U.S.C. § 1681s-2(b)(1)(A)–(C).

26. The investigation required of the furnisher by the FCRA must be "reasonable[.]" *Johnson v. MBNA Am. Bank, NA*, 357 F.3d 426, 431 (4th Cir. 2004). The furnisher must "determine whether the information that they previously reported to a CRA is 'incomplete or inaccurate.'" *Saunders v. Branch Banking and Trust Co. of Va.*, 526 F.3d 142, 148 (4th Cir. 2008) (quoting 15 U.S.C. § 1681s-2(b)(1)(D)).

27. If the disputed information "is found to be inaccurate or incomplete or cannot be verified after any reinvestigation," the furnisher must promptly "modify that item of information," "delete that item of information," or "permanently block the reporting of that item of information." 15 U.S.C. § 1681s-2(b)(1)(E)(i)–(iii).

28. Circuit courts addressing this duty have repeatedly established that information is inaccurate even when it contains technically accurate information if it creates a materially misleading impression.

29. Circuit courts have repeatedly held that, upon receipt of notice of a dispute through a CRA, a furnisher must mark disputed accounts as "disputed."

***Furnishing and the Higher Education Act (HEA)***

30. Title IV of the Higher Education Act (HEA), 20 U.S.C §§ 1070-1099, provides the statutory authorization for the federal student loan program. The HEA requires the Secretary of the Department of Education to implement the federal loan programs. *See* 20 U.S.C. § 1070.

31. In the HEA, Congress directed the Secretary of Education to enter agreements with the CRAs to furnish credit information about student loan borrowers, for the purpose of

"promoting responsible repayment of student loans." 20 U.S.C. § 1080a.[2] Under these agreements, the Secretary must provide to CRAs, among other things, "the remaining balance" of a borrower's loans, as well as "information concerning the repayment status" of the loans. *Id.*

32. The mandatory agreements between the Secretary and CRAs must contain provisions sufficient to ensure that no information about student loans is provided to the CRAs "unless its accuracy and completeness has been verified." *Id.*

33. The HEA's furnishing obligations contemplate and do not conflict with or displace the requirements in the FCRA. *Id.* § 1080a(a) (agreements may require Secretary's timely response to credit disputes "for the purpose of assisting [CRAs] in complying with the [FCRA]"); *id.* § 1080a(a)(3) (statutory requirement to disclose federal loan repayment status to CRAs "shall [not] be construed to affect any otherwise applicable provision of the [FCRA]"); *id.* § 1080a(c)(2) (agreements must provide prompt notice to CRAs of changes to loan information or borrower disputes to ensure CRAs comply with section 1681i of the FCRA).

34. The HEA gives the Secretary the authority to contract with third-party loan servicers to aid with the origination, servicing, and collection of federal student loans. 20 U.S.C. §§ 1082(a), 1087f.

## FACTS COMMON TO THE CLASS

***ED's Furnishing of Federal Student Loan Information***

35. ED utilizes federal student loan servicers to accomplish many of its statutory responsibilities, including responsibilities with respect to consumer credit reporting.

36. In 2024, ED launched the "Unified Servicing and Data Solutions" (USDS) framework, which replaced its existing loan servicing contracts. ED explained that this new USDS

[2] *See also* 20 U.S.C § 1087e(a)(1).

servicing contract contemplates an increased oversight role for ED and a commensurate decrease in the "operational autonomy" of servicers.[3]

37. The Business Operations Servicing Requirements attached to and incorporated with the USDS contract provide eight pages of specific instructions from ED to its servicers about credit reporting.[4]

38. These instructions require servicers to establish themselves as data furnishers with each of the CRAs under the name "U.S. Department of Education" and furnish information about student loans once per month.[5]

39. ED provides detailed instructions about how servicers should describe the status of federal student loan accounts, including but not limited to instructions on describing loan balances and account closure dates and the specific "Report Status Code" that describes each possible repayment status of a federal student loan.

40. ED instructs loan servicers that the correct Report Status Code for a federal student loan cancelled due to Borrower Defense to Repayment (BDR) discharge is "DA," which stands for "delete account."[6]

41. Through its contractual relationship with its servicers and as evidenced by its servicing guidelines, ED retains the ability to direct specific reporting updates to a borrower's credit history and mandates that each loan servicer "provide a contact that [ED] can reach out to

---

[3] Federal Student Aid, *The Next Generation of Loan Servicing*, https://studentaid.gov/sites/default/files/usds-fact-sheet.pdf (last updated April 24, 2023).
[4] Federal Student Aid Business Operations Servicing Requirements, Version 2.8.1. *See* Ex. F to Declaration of Jennifer Farmer in Support of Defendant Higher Education Loan Authority of The State Of Missouri's Motion for Judgment on the Pleadings, *Maldonado v. MOHELA*, No. 3:24-cv-07850-VC (N.D. Cal. May 9, 2025), ECF No. 54-7.
[5] Federal Student Aid Business Operations Servicing Requirements, Version 2.8.1, Section 30000.010, 30000.040.
[6] *Id*. at 30010.60

for ad hoc updates that may be needed due to escalated issues or special circumstances."[7]

42. ED likewise directs servicers to "timely respond to all consumer credit history disputes" and to notify ED of "any trends or issues affecting more than 25 borrowers that are identified [while] responding to disputes." ED requires servicers to store information sent to the CRAs so that furnishing records may be produced to ED "on demand" and "exactly as they had been sent" to the CRAs.[8]

***ED's Group Discharge Decisions***

43. Between April 2022 and January 2025, ED announced its Group Discharge Decisions to grant federal student loan relief to former students at ten separate for-profit educational corporations and institutions based on ED's findings that the educational institutions had committed fraud and misconduct.

44. **Marinello.** On April 28, 2022, ED announced its Group Discharge Decision to cancel all federal student loans associated with Marinello Schools of Beauty ("Marinello") for students who enrolled from 2009 through the Schools' closure in February 2016.[9] In its announcement, ED stated that Marinello engaged in a wide range of misconduct toward its students, including failing to train them "in key elements of a cosmetology program, such as how to cut hair" and leaving them "without instructors for weeks or months at a time as part of a pattern of failing to provide the education it promised." ED stated that it had identified 28,000 individuals with Qualified Loan Debt cancelled by the Marinello Group Discharge Decision. ED stated that it

---

[7] *Id*. at 30022.000

[8] *Id*. at 30020.000, 30021.000, 30023.000

[9] An archived version of ED's announcement is available at https://web.archive.org/web/20220428114300/https://www.ed.gov/news/press-releases/education-department-approves-238-million-group-discharge-28000-marinello-schools-beauty-borrowers-based-borrower-defense-findings.

would "soon" begin notifying these individuals, and that they would "not have to take any additional actions to receive their discharges."

45. **CCI.** On June 1, 2022, ED announced its Group Discharge Decision to cancel all federal student loans associated with "any campus owned and operated" by Corinthian Colleges Inc. ("CCI") for students who enrolled from CCI's founding in 1995 through its closure in April 2015.[10] In its announcement, ED stated that "Corinthian engaged in the wholesale financial exploitation of students, misleading them into taking on more and more debt to pay for promises they would never keep." ED stated that it had identified 560,000 individuals with Qualified Loan Debt cancelled by the CCI Group Discharge Decision. ED stated that the Qualified Loan Debt obligations of these individuals would be "discharged without any additional action on their part."

46. **ITT.** On August 16, 2022, ED announced its Group Discharge Decision to cancel all federal student loans associated with ITT Technical Institute ("ITT") for students who enrolled from January 1, 2005, through ITT's closure in September 2016.[11] In its announcement, ED stated that ITT "engaged in widespread and pervasive misrepresentations related to the ability of students to get a job or transfer credits, and lying about the programmatic accreditation of ITT's associate degree in nursing." ED stated that it had identified 208,000 individuals with Qualified Loan Debt cancelled by the ITT Group Discharge Decision. ED stated that the Qualified Loan Debt of these individuals would be "discharged without any additional action on their part."

[10] An archived version of ED's announcement is available at https://web.archive.org/web/20220601224556/https://www.ed.gov/news/press-releases/education-department-approves-58-billion-group-discharge-cancel-all-remaining-loans-560000-borrowers-who-attended-corinthian-colleges.

[11] An archived version of ED's announcement is available at https://web.archive.org/web/20220817030717/https://www.ed.gov/news/press-releases/education-department-approves-39-billion-group-discharge-208000-borrowers-who-attended-itt-technical-institute.

47. **Westwood.** On August 30, 2022, ED announced its Group Discharge Decision to cancel all federal student loans associated with any location of Westwood College for students who enrolled between January 1, 2002, and November 17, 2015, when the school stopped enrolling new students.[12] In its announcement, ED stated that "Westwood operated on a culture of false promises, lies, and manipulation in order to profit off student debt that burdened borrowers long after Westwood closed." ED stated that it had identified 79,000 individuals with Qualified Loan Debt cancelled by the Westwood Group Discharge Announcement. ED stated that the Qualified Loan Debt of these individuals would be discharged "without any additional action on their part."

48. **CollegeAmerica.** On July 25, 2023, ED announced its Group Discharge Decision to cancel all federal student loans associated with Colorado-based locations of CollegeAmerica for students who enrolled between January 1, 2006, and July 1, 2020.[13] In its announcement, ED stated that its decision was based on evidence that CollegeAmerica's parent company, the Center for Excellence in Higher Education (CEHE), "made widespread misrepresentations" to its students. ED stated that it had identified 7,400 individuals with Qualified Loan Debt cancelled by the CollegeAmerica Group Discharge Decision. ED stated that it would "begin notifying eligible borrowers in August that they are approved for discharges."

49. **Art Institute.** On May 1, 2024, ED announced its Group Discharge Decision to cancel all federal student loans associated with any Art Institute campus for students who enrolled

[12] An archived version of ED's announcement is available at https://web.archive.org/web/20220830100845/https://www.ed.gov/news/press-releases/education-department-approves-15-billion-debt-relief-79000-borrowers-who-attended-westwood-college.

[13] An archived version of ED's announcement is available at https://web.archive.org/web/20230801093042/https://www.ed.gov/news/press-releases/biden-harris-administration-approves-130-million-group-discharge-7400-borrowers-colorado-locations-collegeamerica-0.

on or after January 1, 2004, through October 16, 2017.[14] In its announcement, ED stated that "[f]or more than a decade, hundreds of thousands of hopeful students borrowed billions to attend The Art Institutes and got little but lies in return." ED stated that it had identified 317,000 individuals with Qualified Loan Debt cancelled by the Art Institute Group Discharge Decision. ED stated that the Qualified Loan Debt of these individuals would be discharged "automatically" without any further action on their part.

50. **CEHE**. On January 13, 2025, ED announced its Group Discharge Decision to cancel all federal student loans associated with schools owned by CEHE, including CollegeAmerica (non-Colorado locations), Stevens-Henager College, Independence University, and California College San Diego, for students who attended between January 1, 2006, and August 1, 2021.[15] ED stated that it had identified 73,600 individuals with Qualified Loan Debt cancelled by the CEHE Group Discharge Decision and that these individuals would "receive relief automatically."

51. **Drake College of Business.** On January 13, 2025, ED announced its Group Discharge Decision to cancel all federal student loans associated with any location of Drake College of Business for students who enrolled from January 1, 2008, through Drake's closure on July 31, 2015.[16] In its announcement, ED stated that Drake "extensively recruited at homeless shelters and other temporary housing facilities and lied to borrowers about the promise of 'free

[14] An archived version of ED's announcement is available at https://web.archive.org/web/20240501123756/https://www.ed.gov/news/press-releases/biden-harris-administration-approves-61-billion-group-student-loan-discharge-317000-borrowers-who-attended-art-institutes.
[15] An archived version of ED's announcement is available at https://web.archive.org/web/20250113195453/https://www.ed.gov/about/news/press-release/biden-harris-administration-surpasses-5-million-borrowers-approved-student-loan-forgiveness.
[16] *See* document cited at n.10.

stipends' that were actually student loans," in addition to misrepresentations about the college's job placement assistance. ED stated that it had identified 11,000 individuals with Qualified Loan Debt cancelled by the Drake Group Discharge Decision and that these individuals would "receive relief automatically."

52. **Lincoln Tech.** On January 13, 2025, ED announced its Group Discharge Decision to cancel all federal student loans associated with the Criminal Justice Program at Lincoln Technical Institute's Lowell, Massachusetts, campus for students who attended from 2010 through 2012, and at the Somerville, Massachusetts, campus for students who attended from 2010 through 2013.[17] The announcement referenced a Massachusetts Attorney General investigation which found that Lincoln Tech misled students in these programs about its job placement rates. ED stated that it had identified 280 individuals with Qualified Loan Debt cancelled by the Lincoln Tech Group Discharge Decision.

53. **Ashford.** On January 15, 2025, ED announced its Group Discharge Decision to cancel all federal student loans associated with Ashford University for students who enrolled from March 1, 2009, through April 30, 2020.[18] In its announcement, ED referenced judicial findings from the California Department of Justice's successful litigation against Ashford University and its parent company establishing "widespread misrepresentations in nine separate areas, including students' ability to obtain needed licensure, transfer credits, the cost and amount of financial aid, and the time it would take to earn a degree." ED stated that it had identified 261,000 individuals with Qualified Loan Debt cancelled by the Ashford Group Discharge Decision ED stated that these

---

[17] *See* document cited at n.10.

[18] An archived version of ED's announcement is available at https://web.archive.org/web/20250115193037/https://www.ed.gov/about/news/press-release/biden-harris-administration-announces-group-discharge-261000-borrowers-loans-ashford-university.

individuals "will not need to take any further action to receive relief[] . . . [n]or will they have to make additional payments on these loans."

54. ED has confirmed in public court filings that Group Discharge Decisions are final and that loans identified as Qualified Loan Debt are "unenforceable debt[s] that cannot be legally collected."[19]

55. In January 2025, ED sent additional notices to borrowers with Qualified Loan Debt with the subject line "Confirming your student loan discharge." In this notice, ED stated it was "confirming that if your discharge is still incomplete you do not have to make any more payment on the loan(s) that we are in the process of discharging." It continued, "we will discharge the full remaining balance of your eligible loans and refund all payments you previously made to ED on these loans." ED further noted that, pursuant to its prior determinations, the loans were no longer enforceable:

> ED's prior determination was that the loans described above are not enforceable and that you are no longer obligated to repay them. As a result, ED will not seek to enforce them, and any future attempts to collect on or enforce your repayment obligations are without legal basis. Furthermore, because the loans described above and your repayment obligations are not enforceable, you are entitled to, and will receive, a discharge. This restates the final determination ED communicated in our prior notice.

***ED's Persistent, Inaccurate Furnishing After Group Discharge Decisions***

56. ED directed its student loan servicers to effectuate its Group Discharge Decisions by taking a series of ministerial steps to erase Qualified Loan Debt from borrower accounts in the relevant data systems, and to calculate the amount of payments an individual had made in repayment of Qualified Loan Debt for the purpose of issuing refunds.

57. ED's contract with loan servicers requires them to process BDR discharges and

---

[19] *See e.g. Hemphill v. McMahon*, No. 22-cv-01391-BAH, Joint Status Report, ECF No. 54 (D.D.C. Apr. 13, 2026).

states that servicers "shall maintain compliance with new instructions surrounding borrower defense as they are provided."[20]

58. ED's contract with loan servicers requires them to process discharge transactions and "update credit reporting" for borrower accounts with approved discharges.[21]

59. ED provided loan servicers instructions to complete specific accounting tasks with respect to BDR discharges, including those flowing from its Group Discharge Decisions, in a document titled Change Request 6346 ("Change Request").[22]

60. The Change Request directs loan servicers to complete these accounting tasks within 15 to 45 days, depending on loan type, and to "delete all related credit tradelines at the regular next reporting to the CRAs after the discharge is complete."

61. The Change Request directs servicers to place accounts associated with Qualified Loan Debt into forbearance (for loans in repayment) or into a collection hold (for defaulted loans) pending completion of the above steps.

62. Notwithstanding the timeline set forth in the Change Request, for many borrowers, including Named Plaintiffs, ED's discharge transaction processing related to Group Discharge Decisions has languished for years.

63. Between 2022 and early 2025, ED identified over 1.5 million individuals with Qualified Loan Debt. ED's loan servicers have not yet completed the accounting steps described in the Change Request for a significant number of these individuals.

---

[20] Federal Student Aid Business Operations Servicing Requirements, Version 2.8.1, Section 23018.000.

[21] *Id*. at 23018.070.

[22] *See* Ex. F to Declaration of Jennifer Farmer in Support of Defendant Higher Education Loan Authority of The State Of Missouri's Motion for Judgment on the Pleadings, *Maldonado v. MOHELA*, No. 3:24-cv-07850-VC (N.D. Cal. May 9, 2025), ECF No. 54-7.

64. For example, in the context of litigation related to the Westwood Group Discharge Decision, ED reports that it has yet to complete the discharge accounting steps for 17 percent of individuals (approximately 13,500) with Qualified Loan Debt related to attendance at Westwood. ED reports that it "will not have meaningful additional availability during 2026 to work on effectuating relief for the remaining, eligible Westwood borrowers."[23]

65. Similarly, in the context of litigation related to Corinthian borrowers, ED reports that it has completed the discharge accounting steps for 451,300 Corinthian borrowers,[24] out of the 560,000 individuals identified as having Qualified Loan Debt related to attendance at Corinthian, meaning that ED has not completed the discharge accounting steps for approximately 108,700 (19 percent of) individuals.

66. During this indefinite processing period, ED furnishes information about Qualified Loan Debt to CRAs that describes Qualified Loan Debt as having a specific balance that is due, owing, and increasing monthly.

67. ED furnishes information about Qualified Loan Debt to CRAs that describes the Qualified Loan Debt as "Deferred."

68. ED furnishes information about Qualified Loan Debt to CRAs that lists a specific future date on which a payment is due.

69. This means that, for individuals like Plaintiffs whose loan servicers have not yet administratively processed their loan cancellation, Qualified Loan Debt appears on their credit reports and factors into their credit profile as an existing debt obligation with a growing balance.

---

[23] *See* Joint Status Report, *Hemphill v. McMahon*, No. 22-cv-01391-BAH (D.D.C. Apr. 13, 2026), ECF No. 54.

[24] *See* Joint Status Report at 3, *California v. U.S. Dep't of Educ.*, No. 3:17-cv-7106-SK (N.D. Cal. June 5, 2026), ECF No. 555.

70. Publicly available information shows that a substantial number of federal student loan borrowers find that their credit reports contain inaccurate information about their loans, and that the dispute process is inadequate to correct or prevent these errors from recurring.

71. A FCRA-mandated report from the Consumer Financial Protection Bureau (CFPB) states that the CFPB received 3,400 complaints from individuals with "a problem with a credit report or credit score" related to their federal student loan(s).[25]

72. According to the CFPB's report, "Consumers said they notified their servicer and the CRAs of the inaccuracies, but the inaccuracies were not fixed."

73. The CFPB's complaint database shows the narrative of one federal student loan borrower, submitted in April 2025: "My student loans were forgiven… They are being reported on my credit report as past due. I have now filed for disputes with [the federal loan servicer]. This has been going on now for more than a year and a half. I have spent upwards of 20 hours trying to get my credit report corrected. [The federal loan servicer] continues to report incorrect information despite four times I have disputed this information."

74. Over the course of 2025, ED reduced the number of full-time employees at FSA from 1433 to 777.

75. According to the Government Accountability Office, these staff reductions at FSA "have led to decreased oversight of servicers," as ED "stopped assessing accuracy and call quality for its student loan servicers due to lack of FSA staff capacity" in 2025. Subsequently, ED "informed servicers that it has waived financial penalties relating to this oversight," giving them "less incentive" to maintain accurate account records. GAO's report concludes: "By discontinuing

[25] Consumer Financial Protection Bureau, Consumer Response Annual Report, January 1-December 31, 2025 (March 2026) at 49-50, https://files.consumerfinance.gov/f/documents/cfpb_2025-cr-annual-report_2026-03.pdf.

its oversight of servicer accuracy, FSA limits its ability to identify and remedy systemic servicing issues," and, consequently, "inaccurate records . . . loom as growing risks for borrowers and the federal government."[26]

76. On information and belief, ED has never responded to a FCRA dispute regarding Qualified Loan Debt by correcting its furnishing to reflect that there is no outstanding balance on the loan.

***Harm from Continued Furnishing of Inaccurate Information***

77. The complete and accurate furnishing of information about consumers is important because even small errors can influence the cost of certain services, such as mortgages, automobile loans, and credit cards.

78. Accurate credit reporting for federal student loan information is especially important. Student loan balances tend to be much larger than other consumer debts (excluding mortgages).[27]

79. High reported loan balances on credit reports negatively impact consumers' "debt to income" (DTI) ratios and "amounts owed" metrics.[28]

80. According to a 2022 study from the Urban Institute, DTI is a primary factor in mortgage denials, and student debt is a significant driver of DTI ratios.[29]

---

[26] United States Government Accountability Office, *Federal Student Loans: Education Needs to Address Gaps in Servicer Oversight*, GAO-26-108534 (Mar. 05, 2026).
[27] Dom DiFurio, *How Student Loan Debt Has Increased Over Time*, EXPERIAN (Aug. 24, 2022), https://www.experian.com/blogs/ask-experian/how-student-loan-debt-has-increased/.
[28] *How Can Student Loans Affect Credit Reports?*, EXPERIAN (last visited July 8, 2026), https://www.equifax.com/personal/education/loans/articles/-/learn/how-can-student-loans-affect-credit-/.
[29] Kristin Blagg *et al.*, Urban Institute, *Student Loan Debt and Access to Homeownership for Borrowers of Color* (2022), https://www.urban.org/research/publication/student-loan-debt-and-access-homeownership-borrowers-color.

81. The home mortgage underwriting criteria of the federal government—standards that effectively set the floor for the overall market for home loans—dictate that any federal student loan obligation, even if in forbearance with a $0 monthly payment, factor into a prospective home buyer's DTI ratio.

82. In absence of a fixed monthly payment, Fannie Mae underwriting standards impute 1% of the outstanding balance of a federal student loan in forbearance or deferred as an individual's monthly obligation. This means that a prospective homebuyer with $25,000 of Qualified Loan Debt will have an extra $250 per month of debt obligation. The impact of this on the prospective homebuyer's DTI ratio could only be offset by earning additional income in excess of the additional debt.

83. "Amounts owed" is a constituent metric of a consumer credit profile as computed by FICO. The metric assesses the ratio of the original balance of an installment loan (such as a student loan) to its current balance. Thus, a student loan with an outstanding balance that decreases over time improves a credit profile, whereas a student loan whose balance stagnates or increases over time—as has Qualifying Loan Debt—depresses a credit profile.

84. Credit profiles impact the cost of numerous consumer financial products, from credit cards to auto insurance. For example, drivers with poor credit pay auto insurance premiums that are twice as high as drivers with excellent credit.[30]

85. ED's representation that Plaintiffs and members of the proposed class owe—and are not paying—a debt that they in fact do not owe is defamatory.

---

[30] Douglas Heller & Michael DeLong, Consumer Federation of America, *The One Hundred Percent Penalty: How Auto Insurers' Use of Credit Information Increases Premiums for Safe Drivers and Perpetuates Racial Inequality* (July 31, 2023), available at https://consumerfed.org/wp-content/uploads/2023/07/Official-CFA-Credit-Score_2023-FINAL-REPORT.pdf

86. Contrary to ED's promise that Plaintiffs and members of the proposed class would not need to take any additional steps, ED's continued furnishing of information to CRAs representing Qualified Loan Debt as existing debt obligations has forced Plaintiffs to engage in time consuming, frustrating, and ultimately fruitless interactions with ED, federal loan servicers, and CRAs, and has imposed a mental and emotional burden.

**FACTS CONCERNING NAMED PLAINTIFFS**

***Mandy Woods***

87. Mandy Woods attended Ashford University between June 2013 and May 2015, entirely within the scope of the Ashford Group Discharge Decision.

88. Ms. Woods borrowed approximately $65,000 in federal student loans to attend Ashford University. All of her outstanding federal student loans are Qualified Loan Debt; she has no federal student loans related to attendance at any other school.

89. Following the January 15, 2025, announcement of the Ashford Group Discharge Decision, ED furnished information to CRAs about Ms. Woods's Qualified Loan Debt, including its status as "Deferred," owing, with an active balance, and with the balance increasing monthly.

90. Ms. Woods contacted her federal loan servicer[31] and ED's Office of Federal Student Aid (FSA) multiple times to ask why her Qualified Loan Debt continued to appear on her consumer credit report. These calls went nowhere. Her loan servicer frequently directed her to FSA for further information, which then instructed her to contact her loan servicer, trapping her in a loop.

91. Throughout 2025 and 2026, Ms. Woods submitted complaints about her Qualified Loan Debt to various agencies, including the Better Business Bureau, her congressional

[31] ED placed Ms. Woods's federal student loans for servicing with The Higher Education Loan Authority of Missouri ("MOHELA"), an entity that has entered into a contract with ED to service federal student loans as described in this Complaint.

representative, and the Ombudsman's Office within FSA, which processes borrower complaints.

92. On February 9, 2026, Ms. Woods filed a credit dispute with three CRAs: Equifax, Experian, and TransUnion.

93. Each dispute noted ED's Ashford Group Discharge Decision announcement, which confirmed that eligible borrowers "will not have to make any additional payments on [their] loans" nor "take any further action to receive relief." Each dispute also included her Ashford transcript and diploma confirming that her dates of attendance fell entirely within the period ED identified in its Ashford Group Discharge Decision announcement.

94. Each dispute explained that the credit reporting of an outstanding balance on her Qualified Loan Debt following ED's Group Discharge Decision was inaccurate and "does not reflect the fact that I no longer have an obligation to repay these loans."

95. Each dispute requested that her balance and payment due date information be updated to reflect the fact that she had no present or future obligation to pay any money on her federal student loans.

96. Ms. Woods's dispute also stated:

> The Department and its loan servicers have continued to report outstanding balances for thousands of borrowers who have no obligation to repay these debts after Group Discharge. The Department has sent notices to these borrowers and can easily identify them.
>
> Please correct the credit reporting for everyone whose loans have been discharged through the Group Discharge process.

97. Ms. Woods provided a copy of the disputes to the Department and to her loan servicer.

98. In March 2026, each CRA confirmed to Ms. Woods that it had received her dispute and provided it to ED through its loan servicer for investigation.

99. On March 17, 2026, Ms. Woods's loan servicer responded and said it "received

correspondence regarding an account or relationship that appears to dispute certain information reported to a Consumer Reporting Agency (CRA).” Her loan servicer stated that the dispute was insufficient, explaining that “[t]he correspondence does not provide specific information that is being disputed and an explanation of the basis for the dispute and/or supporting documentation or other information reasonably required for us to substantiate the basis of the dispute.”

100. Her loan servicer concluded by determining, “in accordance with the federal Fair Credit Reporting Act (12 C.F.R. 1022.42),” that “the correspondence is considered to be ‘frivolous’ or ‘irrelevant.’”

101. Subsequently, Ms. Woods filed another complaint with FSA regarding her credit reporting dispute.

102. On May 19, 2026, Ms. Woods received an email response from FSA, acknowledging that her federal student loans were Qualified Loan Debt but not otherwise addressing or remediating her credit dispute.

103. On September 10, 2026, Ms. Woods received a further email from FSA, which acknowledged the error, as well as ED’s failure to correct it, stating

> Your concerns, as we understand them, are regarding sending a credit dispute to the Department of Education (ED) and MOHELA stating you should have no balance on your loans. On January 15, 2025, ED announced a group discharge for loans disbursed to Ashford University, which you attended between June 25, 2013 and May 5, 2015. ED should have instructed MOHELA to discharge your loans. As of the date of this letter, FSA has not directed MOHELA to process your loan discharge. MOHELA will receive a file from FSA once a month with accounts to discharge under Borrower Defense. MOHELA will notify you when your loan discharge is processed.

104. Despite Ms. Woods’s disputes, ED continues to describe her Qualified Loan Debt as having an active (and growing) balance to the CRAs, who have included this inaccurate information on credit reports disseminated to third parties making credit decisions about Ms.

Woods.

105. As of August 2026, Ms. Woods's credit reports stated that she owed a balance of $71,901on her Qualified Loan Debt. This reported balance due is approximately $2,000 more than what ED had been reporting at the time of her February 2026 dispute.

106. Ms. Woods has expended significant time and resources in her attempts to correct ED's inaccurate furnishing.

107. ED's inaccurate furnishing has also caused Ms. Woods to suffer emotional distress.

***Jorge Cortes***

108. Jorge Cortes attended ITT from September 2006 to December 2013. Mr. Cortes took a leave of absence from ITT while he was deployed with the U.S. Marine Corps, but his enrollment was entirely within the scope of the ITT Group Discharge Decision.

109. Mr. Cortes borrowed approximately $54,000 in federal student loans to attend ITT. All of his outstanding federal student loans are Qualified Loan Debt; he has no federal student loans related to attendance at any other school.

110. Following the August 16, 2022, announcement of the ITT Group Discharge Decision, ED furnished information to CRAs about Mr. Cortes's Qualified Loan Debt, including its status as "Deferred," owing, with an active balance, and with the balance increasing monthly.

111. On May 21, 2026, Mr. Cortes filed a credit dispute with three CRAs: Equifax, Experian, and TransUnion.

112. Each dispute noted ED's ITT Group Discharge Decision announcement and its November 2022 individual notice to Mr. Cortes, both of which confirmed Mr. Cortes had no further obligation to repay the loans. Mr. Cortes's disputes explained that the credit reporting of an outstanding balance following ED's ITT Group Discharge Decision was inaccurate and "does

not reflect the fact that I no longer have an obligation to repay these loans."

113. Each dispute requested that his balance and payment due date information be updated to reflect the fact that he no longer had an obligation to pay.

114. Mr. Cortes's dispute also stated:

> The Department and its loan servicers have continued to report outstanding balances for thousands of borrowers who have no obligation to repay these debts after Group Discharge. The Department has sent notices to these borrowers and can easily identify them.
>
> Please correct the credit reporting for everyone whose loans have been discharged through the Group Discharge process.

115. Mr. Cortes provided a copy of the disputes to the Department and to his loan servicer.[32]

116. In June 2026, each CRA confirmed to Mr. Cortes that it had received his dispute and provided it to ED through its loan servicer for investigation.

117. On June 4, 2026, his loan servicer sent Mr. Cortes a letter stating that it had conducted an investigation and determined that "the information we provided to the [CRAs] is accurate." The letter stated that "[t]he FCRA requires lenders and servicers . . . who report information to the [CRAs] to do so with accuracy. Therefore, we cannot remove accurate information from your credit report until the FCRA requires us to do so."

118. Mr. Cortes's loan servicer further stated that it would update its furnishing to note that a FCRA dispute investigation was completed and that Mr. Cortes disagreed with the results.

119. Following Mr. Cortes's disputes, ED continued to describe his Qualified Loan Debt as having an active (and growing) balance to the CRAs, who have included this inaccurate and misleading information on credit reports disseminated to third parties making credit decisions

[32] ED placed Mr. Cortes's federal student loans for servicing with Aidvantage, an entity that has entered into a contract with ED to service federal student loans as described in this Complaint.

about Mr. Cortes.

120. As of August 2026, Mr. Cortes's credit reports stated that he owed a balance of $21,586 on his Qualified Loan Debt.

121. Mr. Cortes has expended significant time and resources in his attempts to correct ED's inaccurate furnishing

122. ED's inaccurate furnishing has also caused Mr. Cortes emotional distress.

## CLASS ALLEGATIONS

123. Plaintiffs seek to represent the following Class:

**Class Definition**

> For the period beginning two years prior to the filing of the complaint in this matter until the date of the Court's class certification order, individuals with an address in the United States and its Territories who: (1) had Federal Student Aid account(s) for Direct or Federal Family Education Loan(s) ("FFEL Loans"); (2) met the criteria for one or more of ED's Group Discharge Decisions; but (3) whose loans ED reported to Credit Reporting Agencies as having an outstanding balance owed on Qualified Loan Debt.

124. Plaintiffs reserve the right to amend the above definition based upon developments in discovery or as otherwise appropriate and permitted.

125. Numerosity: Members of the Class are so numerous that joinder of all members is impracticable. Although the precise number of Class members is known only to Defendant, Plaintiffs aver upon information and belief that the size of the Class exceeds 300,000 people.

126. Commonality: There are questions of law and fact common to the Class that predominate over any questions affecting only individual Class members. The principal questions are: whether ED's reporting of balances due on cancelled and legally unenforceable debts constitutes inaccurate or misleading reporting under the FCRA; whether ED reasonably investigated borrowers' disputes regarding its reporting; whether ED failed to correct the disputed information; whether ED's conduct was negligent, willful, or reckless; and whether members of

the Class are entitled to actual, statutory, and punitive damages as a result.

127. Typicality: Plaintiffs' claims are typical of the claims of the Class. All the claims arise from the same operative facts—ED's cancellation of repayment obligations on Qualified Debt, and its failure to correct its furnishing to CRAs about the Qualified Debt of Plaintiffs and the Class—and are based on the same legal theories.

128. Adequacy: Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs are committed to vigorously litigating this matter. Further, Plaintiffs have secured counsel who are experienced in handling FCRA and other consumer class actions, and who have special expertise in federal student loan litigation. Neither Plaintiffs nor their counsel have any interests that might cause them not to vigorously pursue this claim.

129. This action should be maintained as a class action because the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members which would establish incompatible standards of conduct for the parties opposing the Class, as well as a risk of adjudications with respect to individual members which would, as a practical matter, be dispositive of the interests of other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

130. A class action is a superior method for the fair and efficient adjudication of this controversy. Management of the Class's claims is likely to present significantly fewer difficulties than those presented in many individual claims. The identities of the Class members may be derived from Defendant's records.

## CAUSE OF ACTION

### COUNT ONE
### On Behalf of Plaintiffs and Members of the Class for Defendant's Violation of 15 U.S.C. § 1681s-2(b)

131. Plaintiffs incorporate the foregoing paragraphs as though set forth at length herein.

132. After receiving notice from one or more CRAs of Plaintiffs' and Class members' disputes of inaccurate information that Defendant had previously furnished to the CRAs about them, Defendant negligently or willfully failed to update or modify the reporting to reflect that the loans are not owed, are not legally unenforceable, and that Plaintiffs and Class Members are no longer required to make payments.

133. Defendant violated its obligations under section 1681s-2(b) of the FCRA. Defendant is liable to Plaintiffs and members of the Class for all relief available pursuant to sections 1681n and 1681o of the FCRA.

134. As a result of Defendant's conduct, Plaintiffs and the Class suffered harm including but not limited to financial harm, harm to economic opportunities, emotional distress, and reputational harm.

135. Defendant's violations were negligent and/or willful.

136. Defendant's conduct was willful because it was carried out in knowing or reckless disregard for consumers' rights under the FCRA. Defendant's conduct was intentionally accomplished through its uniform, prescribed procedures, and inconsistent with its own final determination with respect to the loans at issue.

137. Plaintiffs and members of the Class are entitled to actual damages and/or statutory damages of not less than $100 and not more than $1,000 for each and every violation, and are further entitled to recover attorneys' fees and costs from Defendant in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o. Plaintiffs and members of the Class

are also entitled to punitive damages pursuant to 15 U.S.C. § 1681n(a)(2).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, pray for relief as follows:

a) Determining that this action may proceed as a class action;

b) Designating Plaintiffs as the representative for the Class;

c) Designating Plaintiffs' Counsel as counsel for the Class;

d) Issuing notice to the Class at Defendant's expense;

e) Declaring that Defendant committed multiple, separate violations of the FCRA;

f) Declaring that Defendant acted willfully and in deliberate or reckless disregard of the rights of Plaintiffs and the Class under the FCRA;

g) Awarding actual, statutory, and punitive damages as provided by the FCRA;

h) Awarding reasonable attorneys' fees and costs and expenses, as provided by the FCRA; and

i) Granting further relief, in law or equity, as this Court may deem appropriate and just.

## DEMAND FOR JURY TRIAL

Plaintiffs, on behalf of themselves and the Class, demand a trial by jury on all issues triable by a jury.

Respectfully submitted,

Date: September 24, 2026

/s/ *Rebecca Eisenbrey*
Rebecca Eisenbrey, Bar No. MA0063
reisenbrey@ppsl.org
Project on Predatory Student Lending
769 Centre Street
Jamaica Plain, MA 02130
Tel.: 617-322-2808
*Counsel for Plaintiffs*